Shirley **WILDER,** et al., Plaintiffs,

v.

Blanche **BERNSTEIN,** individually and as Administrator of the New York City Human Resources Administration, et al., Defendants.

No. 78 Civ. 957 (RJW).

United States District Court, S.D. New York.

Aug. 12, 1997.

Marcia Robinson Lowry, Susan Lambiase, Rebecca Kim Kimura, Children's Rights, Inc., New York City, for Plaintiffs.

Julie E. O'Neill, Kenneth Michaels, Corporation Counsel of the City of New York, New York City, for Defendants.

## OPINION

ROBERT J. WARD, District Judge.

Plaintiffs have filed an application, pursuant to 42 U.S.C. § 1988 and 28 U.S.C. § 1920, for attorney's fees and out-of-pocket litigation expenses totaling $139,852.31. For the reasons hereinafter stated, plaintiffs are awarded $72,149.15 in attorney's fees and $2,813.46 for out-of-pocket litigation expenses.

## BACKGROUND

Once again the Court is called upon to resolve a dispute arising from this landmark child welfare litigation brought pursuant to 42 U.S.C. §§ 1983, 1985, 1986 and 28 U.S.C. §§ 2201, 2202. In a Judgment dated April 28, 1987, this Court gave final approval to a stipulation of settlement ("the settlement") which guaranteed the rights of children in New York City's foster care system to

> receive services without discrimination on the basis of race or religion and to have equal access to quality services and to ensure that appropriate recognition be given to a statutorily permissible wish for in-religion placement in a manner consistent with principles ensuring equal protection and non-discrimination as defined in applicable New York State and federal laws, regulations and the Constitution.

Stipulation of Settlement at ¶ 4. Familiarity with the opinion in which this Court gave its conditional approval to the settlement, dated October 8, 1986, and reported at 645 F.Supp.

1292 (S.D.N.Y.1986), *aff'd*, 848 F.2d 1338 (2d Cir.1988), is presumed.

The instant controversy involves attorney's fees for the prevailing plaintiffs, who seek compensation for work relating to post-judgment monitoring of the settlement. That plaintiffs "prevailed" for purposes of 42 U.S.C. § 1988 is not disputed by defendants. In the past, the parties have been able to reach agreement regarding the amount of attorney's fees to be paid plaintiffs.[1] For the period covering January 1, 1996 through June 30, 1996, however, the parties have been unable to reach agreement, prompting the instant application by plaintiffs.

## DISCUSSION

### I. Attorney's Fees

 The Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988, authorizes district courts to award prevailing parties in civil rights cases "a reasonable attorney's fee as part of the costs." In addition to recovering attorney's fees incurred in *litigating* a civil rights case, "[s]everal courts have held that, in the context of … 42 U.S.C. § 1988, postjudgment monitoring of a consent decree is a compensable activity for which counsel is entitled to a reasonable fee." *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 559, 106 S.Ct. 3088, 3095, 92 L.Ed.2d 439 (1986) (citing *Garrity v. Sununu*, 752 F.2d 727, 738–39 (1st Cir.1984); *Bond v. Stanton*, 630 F.2d 1231, 1233 (7th Cir.1980); *Miller v. Carson*, 628 F.2d 346, 348 (5th Cir.1980); *Northcross v. Board of Educ. of Memphis City Schools*, 611 F.2d 624, 637 (6th Cir.1979), *cert. denied*, 447 U.S. 911, 100 S.Ct. 2999, 64 L.Ed.2d 862 (1980)). Under the lodestar approach long adhered to by this Circuit, "attorney's fees are calculated by multiplying the number of billable hours that the prevailing party's attorneys spend on the case by 'the hourly rate normally charged for similar work by attorneys of like skill in the area.'" *New York State Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1140 (2d Cir.1983) (quoting *City of Detroit v. Grinnell Corp.*, 560 F.2d 1093, 1098 (2d Cir.1977)).

 Plaintiffs in this litigation are represented by Children's Rights Inc. ("CRI"), a national nonprofit children's advocacy organization (formerly the Children's Rights Project of the American Civil Liberties Union ("ACLU")). That CRI is nonprofit does not preclude it from being awarded fees under 42 U.S.C. § 1988. In *Blum v. Stenson*, the Supreme Court held that "[t]he statute and legislative history establish that 'reasonable fees' under § 1988 are to be calculated according to the prevailing market rates in the relevant community, regardless of whether plaintiff is represented by private or nonprofit counsel." 465 U.S. 886, 895, 104 S.Ct. 1541, 1547, 79 L.Ed.2d 891 (1984).

For the six month period ending June 30, 1996, plaintiffs seek attorney's fees in the amount of $112,457.90 for services rendered by CRI attorneys and paralegals, and out-of-pocket litigation expenses in the amount of $27,394.41. The defendants, led by the City of New York ("defendants," "the City," or "ACS"[2]), argue that the award sought is excessive and that plaintiffs: (1) have not demonstrated the reasonableness of their proposed hourly rates; (2) exercised poor billing judgment; and (3) submitted insufficiently detailed time sheets.

### A. Hourly rates

Using the lodestar approach outlined above, plaintiffs seek fees for attorney and paralegal work in the following amounts:

1. According to defendants, plaintiffs have received attorney's fees in this case in the following amounts: $1,775,000 for the period up to June 27, 1997; $148,000 for the period of 6/27/89 to 11/21/89; $182,852.46 for the period of 11/22/89 to 10/31/90; $222,000 for the period of 11/1/90 to 12/31/91; $530,000 for the period of 1/1/92 to 12/31/93; and $600,000 for the period of 1/1/94 to 12/31/95. These payments total $3,457,852.46.

Declaration of Julie O'Neill in Opp. to Fee App. ("O'Neill Decl.") at ¶ 6 n.1.

2. The Child Welfare Administration ("CWA") used to be part of the City's Human Resources Administration, a Defendant in this action. During major reforms of the City's child welfare system, CWA was dissolved and the Administration for Children's Services ("ACS"), and independent agency, was formed.

| | No. of Hours | | Hourly Rate | | |
|---|---|---|---|---|---|
| Marcia R. Lowry [3] | 47.43 | x | $400 | = | $ 18,972.00 |
| Susan Lambiase [4] | 253.72 | x | $300 | = | $ 76,116.00 |
| Rebecca Kim Kimura [5] | 73.90 | x | $185 | = | $ 13,671.50 |
| Perrin Tomich [6] | 43.15 | x | $80 | = | $ 3,452.00 |
| Natasha Celestine [7] | 3.08 | x | $80 | = | $ 246.40 |
| | | | Total | = | $112,457.90 |

■ The Second Circuit has warned that "attorney's fees are to be awarded with an eye to moderation, seeking to avoid either the reality or the appearance of awarding windfall fees." *Carey*, 711 F.2d at 1139 (internal quotations and citations omitted). The burden is on the applicant to demonstrate that its fees are "in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Blum*, 465 U.S. at 895 n. 11, 104 S.Ct. at 1547 n. 11.

Ideally, evidence of the prevailing market rate should include affidavits from attorneys with similar qualifications stating ... the affiant's personal knowledge of specific rates charged by other lawyers for similar litigation, data about fees awarded in analogous cases, evidence of the fee applicant's rates during the relevant time period, and evidence submitted by other fee applicants in like cases.

*Chambless v. Masters, Mates & Pilots Pension Plan*, No. 80 Civ. 4258, 1988 U.S. Dist. LEXIS 7486, at *10 (S.D.N.Y. July 21, 1988).

CRI submits the affidavit of William Josephson, of counsel to and a former partner of the New York City law firm of Fried, Frank, Harris, Shriver & Jacobson, to support its request for hourly rates of between $185 and $400 for its lawyers. In addition to the Josephson Affidavit, CRI included in its papers a survey entitled, "A Firm–by–Firm Sample of Billing Rates Nationwide," conducted by the National Law Journal and published in the December 2, 1996 issue. The City contends that the hourly rates sought are exorbitant and that civil rights lawyers should not be awarded fees based on hourly rates charged by Wall Street firms.

■ The National Law Journal survey contains sample hourly rates from 102 firms nationwide. Of those firms, only the six located in New York City are in the "same community" as CRI. The six New York City firms surveyed by the National Law Journal, like Fried, Frank, are large firms. According to the survey, they have an average of 264.5 attorneys each. Because they are profit-motivated and serve Fortune 500 companies, banks and financial institutions, large New York City firms are among the most expensive. It would be inappropriate to compensate attorneys at a nonprofit child advocacy organization commensurate with rates charged by the large, for-profit firms in New York City. Therefore, the National Law Journal survey is of limited value.

3. Ms. Lowry is the founder and Executive Director of CRI. She received her law degree from the New York University School of Law in 1969. Before founding CRI, she was the director of the ACLU Children's Rights Project.

4. Ms. Lambiase graduated Brooklyn Law School in 1986. She spent her first four years in practice as an Assistant District Attorney in the Homicide, Sex Crimes and Special Victims Bureaus at the Kings County District Attorney's Office. After being associated with two Philadelphia law firms, she joined CRI in 1995.

5. Ms. Kimura graduated Cornell University's School of Law in 1992 and has been a staff attorney at CRI for two years. Prior to becoming a staff attorney at CRI, she was a staff counsel fellow and volunteer attorney at the ACLU Children's Rights Project.

6. During the billing period, Ms. Tomich was a paralegal with one year's experience.

7. Ms. Celestine was a paralegal with less than one year's experience during the relevant period.

■ In this case, the hourly rates recently awarded in this district under 42 U.S.C. § 1988 are more relevant than the hourly rates Wall Street firms charge their corporate clients. Defendants' Memorandum of Law in Opposition to Plaintiffs' Fee Application included a summary of thirty-two cases in which courts in this district awarded attorneys hourly rates ranging from $125 through $325. Many of the cases, like the instant one, involved civil rights. Additionally, defendants cited five recent cases in this district awarding prevailing civil rights plaintiffs hourly paralegal rates of between $60–$75.

As noted by the Second Circuit in *Carey*, "an award to non-profit lawyers based upon billing rates charged by profit-making lawyers inevitably produces a windfall." *Carey*, 711 F.2d at 1150. In that case, the district court awarded attorney's fees to the New York Legal Aid Society and the New York Civil Liberties Union based upon hourly rates charged by Cravath, Swaine & Moore, a large New York City law firm. The Second Circuit reversed, holding that the "District Court's use of Cravath rates to compensate these non-profit offices was so inordinately generous as to be unreasonable." *Id.*

■ Awarding CRI fees based on the hourly rates of Fried, Frank would likewise produce a windfall. ACS is not a rich corporate client. It is an agency, supported by taxpayer dollars, with a mission to protect children in a City with limited resources. CRI's fees in this case will be calculated based upon the following hourly rates:

| Attorney or Paralegal | Hourly Rate |
| --- | --- |
| Marcia Robinson Lowry | $ 300 |
| Susan Lambiase | $ 220 [8] |
| Rebecca Kim Kimura | $ 130 |
| Perrin Tomich | $ 75 |
| Natasha Celestine | $ 60 |

## B. Number of Hours

■ In determining the "lodestar," the Court must exclude hours that were not "reasonably expended." *Hensley v. Eckerhart*, 461 U.S. 424, 434, 103 S.Ct. 1933, 1939–40, 76 L.Ed.2d 40 (1983). As noted by the Supreme Court,

Counsel for the prevailing party should make a good-faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission. "In the private sector, 'billing judgment' is an important component in fee setting. It is no less important here. Hours that are not properly billed to one's client also are not properly billed to one's adversary pursuant to statutory authority."

*Id.* (quoting *Copeland v. Marshall*, 641 F.2d 880, 891 (D.C.Cir.1980) (en banc)). In addition to disputing the number of hours CRI expended: (1) drafting a letter to the Court dated March 25, 1996, (2) computing its bills, and (3) travelling, defendants challenge some of the activities for which plaintiffs seek reimbursement as non-monitoring activities. They also assert that some tasks performed by attorneys should have been delegated to paralegals. These arguments will be addressed in turn.

### (1) The March 25, 1996 letter to the Court

■ In their application, plaintiffs seek approximately $5,060, reflecting over twenty hours of work by their lawyers, in connection with the preparation of a letter from plaintiffs to the Court dated March 25, 1996. Defendants argue that the hours expended

---

**8.** Defendants contend that Ms. Lambiase attended child evaluation focus group meetings in a non–lawyer, social work capacity, and that the time she spent there should be billed at $75 an hour, the rate charged by plaintiffs' social work expert. The settlement in this case, however, requires that the City perform timely child evaluations. Since the purpose of the child evaluation focus group meetings was to improve the timeliness and quality of child evaluations, the attendance of plaintiffs' counsel seems a reasonable monitoring activity and may be billed at the rate of $220 per hour.

by plaintiffs' counsel (eleven hours of work by Ms. Kimura, nine hours of work by Ms. Lambiase and fifty minutes of work by Ms. Lowry) are excessive.

The ten-page letter, submitted to the Court in anticipation of a March 29, 1996 court conference, is largely factual. In keeping with CRI's business practice, CRI "assigned the least experienced attorney on [the] case to complete the first draft of the letter, in order to keep down costs." Pl.'s Reply Mem. at 19. Plaintiffs also acknowledge, however, that "[m]uch of Ms. Lambiase's time was subsequently required for this court letter, as there were many issues in which she had specialized knowledge...." *Id.* Since the letter concerned facts of which Ms. Lambiase had specialized knowledge, it seems that CRI would have exercised better billing judgment by having Ms. Lambiase draft the letter herself. CRI at least should have limited the amount of time Ms. Kimura spent on the letter. Therefore, Ms. Kimura's hours will be reduced from eleven to five.

### (2) Time spent computing bills

▓ It is well settled that prevailing parties are entitled to reimbursement for the time spent by their attorneys in preparing fee applications. *Gagne v. Maher*, 594 F.2d 336, 343–44 (2d Cir.1979), *aff'd*, 448 U.S. 122, 100 S.Ct. 2570, 65 L.Ed.2d 653 (1980); *Williamsburg Fair Housing Comm. v. Ross–Rodney Housing Corp.*, 599 F.Supp. 509, 521 (S.D.N.Y.1984); *Aller v. New York Bd. of Elections*, 586 F.Supp. 603, 608 (S.D.N.Y. 1984). If in exercising its discretion, however, the Court finds that "the fee claims are exorbitant or the time devoted to presenting them is unnecessarily high, the judge may refuse further compensation or grant it sparingly." *Gagne*, 594 F.2d at 344.

Defendants seek a reduction in the number of hours Ms. Lambiase and Ms. Tomich spent computing CRI's fees for the 1994–95 billing period. The work was performed from January through March 1996, when plaintiffs presented defendants with their bill for the years 1994–95.

▓ Ms. Lambiase expended 14.75 hours computing CRI attorneys' time while Ms. Tomich worked on the bill for 23.57 hours. The Court finds that it was not unreasonable for Ms. Lambiase to expend approximately fifteen hours computing three attorneys' time for a two-year period. Nor was it unreasonable for Ms. Tomich, a paralegal, to spend twenty-three hours compiling data and exhibits for a fee application encompassing a two-year period.

▓ Defendants argue, however, that they should not have to pay for the two hours and forty minutes Ms. Tomich spent drafting and editing the affidavit of Ms. Celestine that was submitted in conjunction with this application, since Ms. Celestine worked on this case for only three hours. It appears that the affidavit of Ms. Celestine was prepared in May 1996, when she left CRI, in anticipation of the instant application. Because Ms. Celestine billed no time drafting the affidavit, Ms. Tomich's time is not duplicative. Given the frequency with which agencies like CRI are required to prepare such affidavits in conjunction with fee applications, and given the simplicity of the form affidavit in question, however, two hours and forty minutes seems excessive and an exercise in poor billing judgment. Therefore, Ms. Tomich's time is reduced by an hour and forty minutes.

### (3) Travel time

▓ Plaintiffs' application for fees includes approximately twenty-seven attorney hours spent travelling to and from court dates and meetings. Plaintiffs seek reimbursement for this time at full hourly rates. Although it is within the Court's discretion to compensate counsel for travel time at full hourly rates, *Jennette v. City of New York*, 800 F.Supp. 1165, 1170 (S.D.N.Y.1992), courts in this circuit customarily reimburse attorneys for travel time at fifty percent of their hourly rates. *Id.; see e.g., Clark v. Phillips*, 965 F.Supp. 331, 336 (N.D.N.Y. 1997); *DeCarlo v. Perales*, 963 F.Supp. 181, 184 (N.D.N.Y.1997); *Davis v. City of New Rochelle*, 156 F.R.D. 549, 559 (S.D.N.Y.1994); *Loper v. New York City Police Dep't*, 853 F.Supp. 716, 720 (S.D.N.Y.1994); *In Re Agent Orange Prod. Liab. Litig.*, 611 F.Supp. 1296, 1321–22, 1349 (E.D.N.Y.1985), *aff'd in*

*part, rev'd in part,* 818 F.2d 226 (2d Cir. 1987).

 This Court agrees that time spent by attorneys in transit "'may [be] beneficial, but it probably [is] not as productive as time at the office or in court.'" *Jennette,* 800 F.Supp. at 1170 (quoting *Society for Good Will to Retarded Children, Inc. v. Cuomo,* 574 F.Supp. 994, 998 (E.D.N.Y.1983), *order vacated on other grounds,* 737 F.2d 1253 (2d Cir.1984), *order reinstated on remand,* 103 F.R.D. 169 (E.D.N.Y.1984)). Therefore, CRI attorneys will be reimbursed for travel time at fifty percent of the determined hourly rates.

 Defendants also contest the billings associated with a meeting in Washington D.C. on March 27, 1996 among Ms. Lowry, Ms. Lambiase and Dr. Susan Wells, the City's consultant on the development and implementation of the Classification System. Plaintiffs claim that they had made several unsuccessful attempts to schedule a meeting with Dr. Wells, who lived in North Carolina at the time.[9] Because both Ms. Lowry and Dr. Wells would be in Washington on the same day for other meetings, they agreed to meet there. Ms. Lambiase flew down from New York to join them.[10] While the City asserts that the meeting could have been conducted over the telephone, plaintiffs contend that due to the sensitivity of the topics to be discussed, it was preferable that the parties meet in person.

Given the difficulties plaintiffs encountered in trying to meet with Dr. Wells, it does not seem unreasonable that they ultimately arranged to meet her in Washington. The Court will allow plaintiffs to recover for Ms. Lambiase's travel time and expenses. Since Ms. Lowry was in Washington D.C. on other business, however, plaintiffs will not be compensated for the two hours and twenty minutes she billed as travel time.

The following hours will be billed at fifty percent of the attorneys' respective hourly rates:

| Attorney | No. of Travel Hours | Travel Rate |
|---|---|---|
| Marcia R. Lowry | 2.42 | $ 150 |
| Susan Lambiase | 19.42 | $ 110 |
| Rebecca Kim Kimura | 3.00 | $ 65 |

### (4) Non-monitoring activities

Defendants claim that plaintiffs' fee application includes attorney time spent on what they classify as non-monitoring activities. Primarily, defendants challenge attorney time billed by CRI in connection with the related managed care litigation.[11]

In December 1995, as part of their monitoring activities, plaintiffs sought a preliminary injunction to prevent the City from implementing CWA's Proposal for Managed Care: Project TOPP ("the managed care proposal"). On January 10, 1996, the parties settled the managed care litigation by signing a stipulation ("the stipulation") that prohibited the City from implementing the managed care proposal before April 1, 1996. Additionally, the City was required to provide plaintiffs with a copy of any version of the managed care proposal twenty days before its implementation.

 Defendants do not dispute the hours plaintiffs billed for litigating the preliminary injunction. They claim, however, that plaintiffs' attempt to seek attorney's fees for work on managed care issues after January 10,

---

**9.** The problems faced by plaintiffs are documented in the Affidavit of Susan Lambiase at ¶¶ 2–13 and included the refusal of defendants to reimburse Dr. Wells for travel to New York.

**10.** The presence of both Ms. Lowry and Ms. Lambiase was required since each attorney was an expert on one of the two different issues to be discussed.

**11.** Plaintiffs have withdrawn their claim for forty–eight minutes of Ms. Celestine's time which defendants argued was completely unrelated to *Wilder* monitoring activities.

1996 shows a lack of billing judgment. Although during the remainder of the billing period, no managed care proposal was ever submitted, plaintiffs seek to recover attorney's fees for approximately one hour of Ms. Lowry's time and fifteen hours of Ms. Lambiase's time spent on managed care issues.

Forty minutes of Ms. Lowry's time consisted of telephone conversations and conferences with plaintiffs' expert regarding managed care and a ten-minute review of a document concerning managed care. Ms. Lambiase spent the majority of her post-stipulation time (thirteen of her fifteen hours) at managed care task force meetings. According to plaintiffs, Ms. Lambiase attended those meetings to "keep plaintiffs' [sic] informed of the issues and problems in managed care, given the possibility of further litigation in this area in the near future." Pl.'s Reply Mem. at 16.

The relevant issue is "whether, at the time the work was performed, a reasonable attorney would have engaged in similar time expenditures." *Grant v. Martinez*, 973 F.2d 96, 99 (2d Cir.1992), *cert. denied*, 506 U.S. 1053, 113 S.Ct. 978, 122 L.Ed.2d 132 (1993). While the stipulation provided a temporary solution to the managed care litigation, it was by no means a final determination of the issues. In the stipulation, plaintiffs reserved the right to seek further injunctive relief should defendants try to implement another version of the managed care proposal. CRI's billings in this area appear reasonable given its "ongoing obligation to monitor, understand, and possibly improve the development of the city's managed care plan or seek another injunction." Pl.'s Reply Mem. at 16. Therefore, plaintiffs will be compensated for the sixteen hours of time spent by their attorneys after January 10, 1996 on the issue of managed care.

#### (5) Paralegal tasks

Defendants contend that an hour and forty-six minutes spent by Ms. Lambiase performing nine tasks could easily have been completed by a paralegal at a lower billing rate. These activities include the review of mail, three one-minute telephone calls, a two-minute telephone call and a seven-minute telephone call.

■ Attorneys must review their mail to remain apprised of events in a case. It would be irresponsible of them to delegate that task. Likewise, it seems unreasonable to require an attorney to delegate a one-, two- or even seven-minute telephone call. The time spent delegating the task could well exceed the time spent by the attorney making the telephone call herself.

■ The fifty-eight minutes spent by Ms. Lambiase reviewing and organizing documents also seems a reasonable attorney task. The only work done by Ms. Lambiase that ostensibly could have been performed by a paralegal or a secretary was the four-minute fax of a letter to defense counsel and the nineteen-minute telephone call to reschedule a meeting. Therefore, the twenty-three minutes of Ms. Lambiase's time spent on those tasks should be compensated at the paralegal rate of $75.

#### C. Lodestar amounts for Ms. Lambiase and Ms. Lowry

■ Defendants allege that with respect to Ms. Lambiase's time records, plaintiffs "failed to comply with *Carey*'s mandate to document their application with contemporaneous records, specifying 'the nature of the work done.'" Defs.' Mem. of Law in Opp. to Fee App. at 23 (quoting *Carey*, 711 F.2d at 1148). Although contemporaneous time records need not contain great detail and specificity, counsel should at least identify the general subject matter of their time expenditures. *Hensley*, 461 U.S. at 437 n. 12, 103 S.Ct. at 1941 n. 12. If "the time records submitted in support of a fee application lack sufficient specificity for the Court to assess the reasonableness of the amount charged in relation to the work performed, the Court is justified in reducing the hours claimed for those entries." *Mautner v. Hirsch*, 831 F.Supp. 1058, 1077 (S.D.N.Y.1993) (citing *United States Football League v. National Football League*, 704 F.Supp. 474, 486 (S.D.N.Y.), *aff'd*, 887 F.2d 408, 415 (2d Cir. 1989), and *Meriwether v. Coughlin*, 727 F.Supp. 823, 827 (S.D.N.Y.1989)).

Certain descriptions in CRI's time sheets, for example, "reviewed correspondence," "reviewed docs," and "TC w/ Elaine Walsh," are vague and inadequate in that they fail to identify the subject matter of the documents reviewed or the topic of conversation. *See Ragin v. Harry Macklowe Real Estate Co.,* 870 F.Supp. 510, 520 (S.D.N.Y.1994) (reducing lodestar by 30% due in part to vague time entries such as "telephone call to S. Berger," "Review Macklowe files," and "conference with T. Holzman"); *Meriwether,* 727 F.Supp. at 827 (reducing lodestar by 15% for vague time entries such as "telephone conference with defendant" and "reviewing new client material"); *Orshan v. Macchiarola,* 629 F.Supp. 1014, 1019 (E.D.N.Y.1986) (disallowing a claim for fees for time supported only by such specifications as "prepare correspondence" and "review correspondence"). Attorneys should add a reference line to such entries, indicating the subject of the conference or documents, making descriptions such as "TC w/ Court re: adjournment" acceptable. That such descriptions are preferable is borne out by the fact that most of CRI's entries are written that way.

■ Ms. Lambiase's time sheets also include entries that lump together more than one activity. Such clustered descriptions are vague, since they fail to make clear the exact amount of time spent by her on each task. Fee applicants should not

> lump several services or tasks into one time sheet entry because it is then difficult if not impossible for a court to determine the reasonableness of the time spent on each of the individual services or tasks provided.... It is not the court's job to

decipher time entries and guess how much time each activity took ... [i]t is the responsibility of the applicant to make separate time entries for each activity.

*In re Poseidon Pools of America, Inc.,* 180 B.R. 718, 731 (Bankr.E.D.N.Y.1995) (internal quotations and citation omitted). Given that the Court is reimbursing travel time at fifty percent, particularly troublesome are entries that include travel to and attendance at meetings or court conferences. Examples of clustered entries of Ms. Lambiase include:

| Date | Time | Description |
|---|---|---|
| 1/3/96 | 1:40 | Travel to mtg w/ panel, meet w/ panel re: kinship case review w/ EW |
| 1/29/96 | 2:45 | Travel to Panel mtg; meet w/ Panel, EW, RKK re: classification |
| 2/19/96 | 0:50 | Review Panel proposal re: kinship placements; gather all prior corresp. re: same |
| 4/23/96 | 3:19 | Travel to and from NYC; Managed Care Task Force mtg |
| 5/6/96 | 2:07 | Meet w/ defs re: M–309; travel to & from mtg |
| 6/5/96 | 2:00 | Edit Wilder letter; TC's w/ MRL, JON, DS re: ltrs; edit again; TC w/ RT re: same; TC w/ PT re: contents of letter |

■ The Court's review of CRI's time sheets reveals that, although the majority of the entries were sufficiently detailed, Ms. Lowry and Ms. Lambiase made cryptic and vague time entries frequently enough to warrant a ten percent reduction in their lodestar calculations.

The following is a summary of the number of hours and the hourly rates at which plaintiffs' counsel will be compensated:

| Attorney | No. of Hours | | Hourly Rate | Total |
|---|---|---|---|---|
| Marcia R. Lowry | 38.30 | × | $300 | $11,490.00 |
| " " | 2.42 | × | $150 | $ 363.00 |
| Susan Lambiase | 209.81 | × | $220 | $46,158.20 |
| " " | 19.42 | × | $110 | $ 2,136.20 |
| " " | .38 | × | $ 75 | $ 28.50 |
| Rebecca Kim Kimura | 64.90 | × | $130 | $ 8,437.00 |
| " " " | 3.00 | × | $ 65 | $ 195.00 |
| Perrin Tomich | 43.15 | × | $ 75 | $ 3,236.25 |
| Natasha Celestine | 1.75 | × | $ 60 | $ 105.00 |

**GRAND TOTAL:** $72,149.15

## II. Expenses

Defendants also challenge the expenses sought by plaintiffs' attorneys. The following are expenses for which counsel seeks reimbursement:

| | |
|---|---|
| Delivery of Services | $ 717.50 |
| Expert Fees | $24,562.00 |
| Faxes | $ 13.50 |
| Photocopies | $ 262.74 |
| Telephone | $ 93.32 |
| Lexis | $ 134.61 |
| Subscription | $ 18.95 |
| Transcripts | $ 1,227.99 |
| Travel | $ 363.80 |
| | |
| Total | $ 27,394.41 |

The City contends that plaintiffs' expert fees are non-compensable. Further, the City argues that plaintiffs' attorneys improperly seek reimbursement for taxis and for a subscription.

### A. Expert fees

■ In *West Virginia Univ. Hosps., Inc. v. Casey,* 499 U.S. 83, 102, 111 S.Ct. 1138, 1148–49, 113 L.Ed.2d 68 (1991), the Supreme Court held that 42 U.S.C. § 1988 did not convey the authority to shift expert fees to the losing party as part of a "reasonable attorney's fee" in a § 1983 case. Plaintiffs cite *Missouri v. Jenkins,* 491 U.S. 274, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989), a case predating *Casey* and involving paralegal and law clerk fees, for the proposition that expert fees are compensable under § 1988. In *Jenkins,* the Court held as follows:

> We begin with the statutory language, which provides simply for "a reasonable attorney's fee as part of the costs." 42 U.S.C. § 1988. Clearly, a "reasonable attorney's fee" cannot have been meant to compensate only work performed personally by members of the bar. Rather, the term must refer to a reasonable fee for the work product of secretaries, messengers, librarians, janitors, and others whose labor contributes to the work product for which an attorney bills her client; and it also must take account of other expenses and profit.

*Id.* at 285, 109 S.Ct. at 2470. Plaintiffs argue that the work of their expert, Elaine Walsh, contributed greatly to their work product and thus is compensable under *Jenkins.* Such an application of *Jenkins,* however, would violate *Casey*'s proscription of the shifting of expert fees under 42 U.S.C. § 1988.[12] Plaintiffs will therefore bear their own expert fees.

### B. Taxis and Subscription

■ Defendants argue that taxi fares are "extravagances" that should not be borne by New York City taxpayers. While it is true that New York City has reliable means of public transportation, to call $300 worth of taxi fares extravagances is somewhat of an exaggeration. When travelling in small groups, as attorneys frequently do on their way to court or to meetings, taxis are often as economical as the subway or bus. Additionally, taxis are usually quicker, reducing the amount of time attorneys spend in transit. Therefore, taxis are a reasonable and compensable expense.

■ Last and certainly least, defendants argue that they should not have to pay for an

---

**12.** After *Casey,* Congress enacted the Civil Rights Act of 1991, which amended 42 U.S.C. § 1988 to give courts discretion to shift expert fees to the losing party in cases arising under 42 U.S.C. §§ 1981 and 1981(a). Pub.L. 102–166, Title I, §§ 103, 113(a), Nov. 21, 1991, 105 Stat. 1074, 1079. As Congress explicitly limited the amendment to cases arising under § 1981, *Casey* still prohibits the award of expert fees in § 1983 cases.

$18.95 subscription entitled *CWLA Standards on Kinship Care.* Since plaintiffs' attorneys concede that the subscription was purchased to obtain background information on kinship care, it is not compensable. Having deducted the expert fees totaling $24,562, and the $18.95 subscription, plaintiffs' attorneys will be reimbursed for expenses in the amount of $2,813.46.

## *CONCLUSION*

For the foregoing reasons, plaintiffs' application pursuant to 42 U.S.C. § 1988 is granted. Plaintiffs are awarded $72,149.15 for attorney's fees and $2,813.46 for out-of-pocket litigation expenses.

It is so ordered.